Exhibit E.

Deposition of Jim DeFea

```
 1                 IN UNITED STATES DISTRICT COURT
                    DISTRICT OF SOUTH DAKOTA
 2                      WESTERN DIVISION

 3

 4   Patricia Gregerson,                     Civ. 18-5044-JLV

 5                  Plaintiff,

 6        -vs-

 7   Farm Bureau Property and
     Casualty Insurance Company,
 8
                    Defendant.
 9

10   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11
                    D E P O S I T I O N  O F
12
                         Jim DeFea
13

14   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

15
     APPEARANCES:       Mr. Daniel K. Brendtro
16                      Mr. Robert D. Trzynka
                        Brendtro Law Firm
17                      Sioux Falls, South Dakota

18                      Attorneys for the Plaintiff.

19
                        Mr. Mark J. Arndt
20                      Evans, Haigh & Hinton
                        Sioux Falls, South Dakota
21
                        Attorney for the Defendant.
22

23

24

25
```

```
 1                      INDEX OF EXAMINATIONS

 2    By Mr. Brendtro:                             Page   4

 3                       INDEX OF EXHIBITS

 4    NUMBER   DESCRIPTION                         REFERENCED

 5      1     Insurance policy                      9, 11

 6      2     Claims file                           8, 10

 7      3     12/29/16 Fritz letter to Holloway re    5
              coverage
 8

 9

10                     *  *  *  *  *  *  *  *

11

12

13

14     (Original transcript and exhibits provided to Mr. Brendtro.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              S T I P U L A T I O N

 2         It is hereby stipulated and agreed, by and between

 3    the above-named parties through their attorneys of

 4    record, whose appearances have been hereinabove noted,

 5    that the deposition of Jim DeFea may be taken at this

 6    time and place, that is, at the offices of Evans, Haigh &

 7    Hinton, Sioux Falls, South Dakota, on the 11th day of

 8    June, 2019, commencing at the hour of 3:30 p.m.; said

 9    deposition taken before Kerry Lange, FAPR, RMR, a Notary

10    Public within and for the State of South Dakota; said

11    deposition taken for the purpose of discovery or for use

12    at trial or for each of said purposes, and said

13    deposition is taken in accordance with the applicable

14    Rules of Civil Procedure as if taken pursuant to written

15    notice.  Objections, except as to the form of the

16    question, are reserved until the time of trial.  Insofar

17    as counsel are concerned, the reading and signing of the

18    transcript by the witness are waived.

19

20              *  *  *  *  *  *  *  *  *  *

21

22

23              JIM DEFEA,

24    called as a witness, having been first duly sworn,

25    testified as follows:
```

DAKOTAH REPORTING AGENCY
605-338-8898

```
1          EXAMINATION BY MR. BRENDTRO:
2     Q    Go ahead and state your name.
3     A    Jim DeFea.
4     Q    Jim, have you had your deposition taken before?
5     A    Yes, I have.
6     Q    How many times?  Hang on.
7     A    Oh --
8               MR. BRENDTRO:  I'm going -- we've started the
9          deposition.  I'm going to just reask those questions for
10         the video, if that is all right with you, Mark.
11              MR. ARNDT:  Sure.
12    Q    Go ahead and state your name.
13    A    Jim DeFea.
14    Q    Jim, have you had your deposition taken before?
15    A    Yes, I have.
16    Q    How many times?
17    A    Five or six.
18    Q    Was it in the context of insurance disputes?
19    A    Yes, it was.
20    Q    Were any of those insurance disputes involving claims of
21         bad faith or claims of malpractice?
22    A    Yes, they were.
23    Q    Would that be all of them or just some of them?
24    A    I know two of them for sure.  I can't remember for sure
25         about the others.  I'm sorry.
```

```
 1   Q   I'll have you take a look at Exhibit 3.  Were you
 2       involved in the hiring of Tom Fritz?
 3   A   Yes.
 4   Q   Was it your decision or someone else's decision?
 5   A   It was a joint decision.
 6   Q   What was the purpose of hiring Mr. Fritz?
 7   A   To facilitate discussions with Mr. Holloway.
 8   Q   Was his job to convey the position of Farm Bureau to
 9       Mr. Holloway?
10   A   Yes.
11   Q   Was Mr. Fritz hired to evaluate and give advice about the
12       claim itself?
13   A   Yes.
14   Q   Are you familiar with the letter then that he sent on
15       December 29th of 2016 to Mr. Holloway?
16   A   Yes.
17   Q   Mr. Holloway was the Gregersons' attorney?
18   A   Yes.
19   Q   In that letter, Mr. Fritz states that Farm Bureau has
20       concluded its investigation.  Do you see that?
21   A   Yes.
22   Q   Would that be an accurate statement as of December 19 --
23       or sorry, as of December 29th, 2016?
24   A   Yes.
25   Q   And the conclusion from its investigation is that Karl
```

```
 1        Knutson converted the Gregersons' cattle?
 2   A    It doesn't say that.
 3   Q    Would that be an accurate statement of what the
 4        conclusion was?
 5   A    Yes.
 6   Q    Do you know upon what date Farm Bureau made that
 7        conclusion?
 8   A    I don't know the specific date.  It would have been
 9        before this letter.
10   Q    Would it have been while Leonard Gregerson was still
11        alive?
12   A    I'm not sure when Mr. Gregerson passed away.
13   Q    Would it have been -- would that have been -- strike
14        that.  Would the conclusion that Karl Knutson converted
15        Gregersons' cattle been Farm Bureau's position as of the
16        time that you and Leonard spoke on the phone in February
17        of 2015?
18   A    Yes.
19   Q    And so Farm Bureau had concluded its investigation into
20        the facts long before this letter, is that accurate?
21   A    Yes.
22   Q    The second part of Mr. Fritz's letter says that Farm
23        Bureau has made the determination that there is coverage
24        under the policy.  Do you see that?
25   A    I see that.
```

1    Q    Is that an accurate statement?

2    A    Yes and no.  We still to this day maintain our position

3         of -- regarding the coverage and the exclusions that were

4         applicable.

5    Q    That was the conversion exclusion?

6    A    Yes, sir.

7    Q    How is it that Mr. Fritz came to write a letter then that

8         says there is coverage?

9             MR. ARNDT:  Well, I'll object to the extent that it

10        calls for speculation if you're asking about Attorney

11        Fritz's mindset.

12   A    I'm not sure what Tom's intent was by choosing this

13        verbiage.  It wasn't our decision that the coverage

14        exclusions were not in place as they had been.  I don't

15        know what Tom's intent was by choosing these words.

16   Q    Did you review this letter around the time of

17        December 29th, 2016 after he sent it?

18   A    After he sent it, yes.

19   Q    Did you talk to him about the language of his letter

20        after he sent it?

21   A    I did not.

22   Q    And so you did not challenge his statement that Farm

23        Bureau made the determination that there was coverage

24        under the policy?

25   A    I did not.

1  Q   Do you know if anybody from Farm Bureau challenged
2      Mr. Fritz's conclusion?
3  A   I know that everyone at Farm Bureau had the same opinion
4      about coverage as I had.
5  Q   That the conversion exclusion applied?
6  A   Yes.
7  Q   And the conversion exclusion is something that -- well,
8      is the exclusion that you're relying upon when you sent
9      Leonard and Patty Gregerson a letter in February of 2015?
10 A   That exclusion and others.
11 Q   If you turn to Exhibit 2, Page 286.  Is that the letter
12     that you wrote to Leonard and Patty denying coverage for
13     their cattle loss?
14 A   Yes, it is.
15 Q   Where does it say that you're relying upon the conversion
16     exclusion?
17 A   I believe we would have intended it to be part of -- on
18     Page 7, Paragraph 2, "Additional Exclusions Applicable to
19     Animals, Number 5, Infidelity of your employees or other
20     persons to whom your animals are entrusted."
21 Q   And also Number 6?
22 A   We would have relied upon that as well; "Escape
23     mysterious disappearance, wrongful conversion, or
24     embezzlement."
25 Q   And this wasn't a mysterious disappearance, though.  We

1    had evidence of conversion, right?

2  A  The animals were never found, so any one of the items

3     listed on 4, 5 or 6 or 7 would have triggered the

4     coverage consideration.

5  Q  **And does the letter say where in the policy we can find**

6     **those?**

7  A  I'm not sure.  It references the scheduled personal

8     property module back on Page FB0290.  And then we would

9     have provided a full copy of the policy for that module

10    when we received it.

11 Q  **Okay.  And that property module has a code on it,**

12    **PKSD.MSCHP.0508?**

13 A  That's correct.

14 Q  **And that refers to a policy module in the Gregerson**

15    **policy?**

16 A  Yes, sir.

17 Q  **Let's turn to that module in Exhibit 1 of Gregersons'**

18    **policy.  First, do you agree that is a certified copy of**

19    **the Gregerson policy?**

20 A  Yes, it.

21 Q  **And you turn to the second page.  Do you agree that it**

22    **was the policy that was in force at the time of the loss?**

23 A  Yes, it is.

24 Q  **Okay.  And then can you then turn to that module that you**

25    **referenced, PKSD.MSCHP.0508 which I think you called the**

1     schedule of personal property module.

2  A  It might take me a few minutes to find that.  I'm not

3     sure what order this is in.  (Reviewing.)  Looks like it

4     starts on Page 173.

5  Q  **And so if I'm on Page 173 of the policy, you're saying**

6     **that is module PKSD.MSCHP.0508?**

7  A  I'm showing PKSD.SPROP.508.

8  Q  **So that's -- that's different then, right?**

9  A  Property section.  (Reviewing.)  Oh, I'm sorry.  PK --

10    PKSD.MFRPP.508.

11 Q  **On Page 5 of your letter you described it as**

12    **PKSD.MSCHP.0508?  Your letter was Page 290 of Exhibit 2.**

13 A  That's for the scheduled, and the farm/ranch personal

14    property would be the PKSD.MFRP.508 -- 0508.  I'm sorry.

15 Q  **Okay.  And so are you telling me then that those**

16    **exclusions listed on Page 292 of your letter are not from**

17    **PKSD.MSCHP.0508?**

18 A  (Reviewing.)  PKSD.SPROP.0508 on Page FB288 discusses the

19    named causes of loss, with reference on Page FB0289 to

20    "10.  Theft.  We cover direct physical loss to or of

21    covered property caused by theft or attempted theft.

22    There is no coverage for g., loss of farm/ranch personal

23    property or business personal property by losing,

24    misplacing, mysterious disappearance or where the only

25    evidence of a shortage is disclosed upon taking an

```
 1          inventory."
 2   Q   We were talking, though, about a conversion exclusion on
 3       Page 292.
 4   A   PKSD.MSCHP.0508.
 5   Q   Would it help you to look at the list of policy forms and
 6       endorsements?
 7   A   No.  I'm looking for the form in with the policy material
 8       here.  (Reviewing.)  I'm not seeing that form here unless
 9       it's -- I'm missing it.
10   Q   Can you turn to Page 74 of Exhibit 1.
11   A   Yes.
12   Q   Is there a listing of policy forms and endorsements?
13   A   Yes, there is.
14   Q   And do you see PKSD.MSCHP.0508 listed on the Gregersons'
15       policy forms and endorsements?
16   A   I do not.
17   Q   That would not be part of the policy, would it?
18   A   That would be correct.
19   Q   But nonetheless in your letter you quoted extensively
20       from that, including on Pages 5, 6 and 7.  Correct?
21   A   Correct.
22   Q   And in so doing, you misrepresented the policy provisions
23       to the Gregersons?
24   A   My only explanation is a typo.
25   Q   A typo that --
```

1    A    Of the form referenced.

2    Q    **So it's your testimony then that that exclusion on Page 7**

3         **of your letter appears somewhere in the policy, meaning**

4         **the conversion exclusion?**

5    A    The conversion exclusion would apply to scheduled

6         property.

7    Q    **My question, though, is it your testimony that there is a**

8         **conversion exclusion for scheduled property that exists**

9         **in this policy?**

10   A    Yes.

11   Q    **Where is it?**

12   A    In the pol -- oh, in the Gregersons' policy, they did --

13        no, they did not have any animal specifically scheduled.

14        Their animals were scheduled by class, so the coverage

15        would be different.

16   Q    **So these exclusions and all this policy languaged listed**

17        **on Pages 5, 6 and 7 isn't in the policy?**

18   A    That form is not attached to their policy, no.

19   Q    **It's not included in their policy, is it?**

20   A    Correct.

21   Q    **And so it would be improper to apply exclusions to the**

22        **Gregersons' claim that aren't part of the policy, right?**

23   A    That's correct.

24   Q    **It would be improper to misrepresent policy provisions to**

25        **the Gregersons that aren't in their policy, is that**

| | | |
|---|---|---|
| 1 | | correct? |
| 2 | A | That's correct. |
| 3 | Q | It would not be fair to the Gregersons for that to |
| 4 | | happen, would it? |
| 5 | A | That would be correct. |
| 6 | Q | Mr. DeFea, how long have you worked at Farm Bureau? |
| 7 | A | Twenty-five years. |
| 8 | Q | Did you have a job prior to Farm Bureau working in |
| 9 | | insurance? |
| 10 | A | I worked for ten years for Colonial Nationwide and I |
| 11 | | worked three years for American Family. |
| 12 | Q | When you started at Farm Bureau, what was -- what was |
| 13 | | your position or your job duties? |
| 14 | A | Senior claims rep, field, multi-line. |
| 15 | Q | How long were you in that position? |
| 16 | A | From '93 until '98. |
| 17 | Q | As a senior claims staffer, what did you do? |
| 18 | A | Multi-line claims, property and casualty. |
| 19 | Q | Did some of those involve livestock? |
| 20 | A | Yes, they did. |
| 21 | Q | As part of that function in the company, did you -- were |
| 22 | | you trained about Farm Bureau's practices? |
| 23 | A | Yes, I was. |
| 24 | Q | Farm Bureau taught you how to read a policy? |
| 25 | A | Yes, they did. |

```
 1   Q   Taught you where to go look for a policy?
 2   A   Yes, they did.
 3   Q   Taught you how to apply facts to the policy provisions?
 4   A   Yes, they did.
 5   Q   After 1998, what was your role at Farm Bureau?
 6   A   I was with the Iowa Farm Bureau as a bodily injury
 7       specialist.  I'm not sure about the exact title.
 8   Q   Car crash cases?
 9   A   Yeah.
10   Q   How long was --
11   A   Yes.
12   Q   -- your position with --
13   A   I was in Iowa for two years.
14   Q   After that?
15   A   I moved back to South Dakota.
16   Q   What was your function then in South Dakota?
17   A   I actually worked for the Minnesota Farm Bureau as a
18       senior field claim rep.
19   Q   How long did you have that role?
20   A   Ten years.
21   Q   And your role after that?
22   A   I was the South Dakota business center claim consultant.
23   Q   Tell me what you do in that role.
24   A   That was essentially the claim manager role.
25   Q   Meaning you managed the adjustors?
```

1   A   Correct.

2   Q   **In your claims experience prior to being a claims**

3       **manager, did you handle livestock claims?**

4   A   Yes.

5   Q   **Theft claims?**

6   A   Yes.

7   Q   **In your role as a claims manager, did you oversee**

8       **livestock claims?**

9   A   Yes.

10  Q   **Including theft of livestock claims?**

11  A   Yes.

12  Q   **Did you participate in drafting denial letters to other**

13      **farmers in livestock theft claims?**

14  A   Yes.

15  Q   **Do you have an estimate of how many?**

16  A   No.

17  Q   **How long were you the South Dakota claims manager?**

18  A   April of 2010 until Drew's arrival.  I think it was 2015.

19      I'm not sure about the exact date.

20  Q   **Would -- would July of 2016 sound about right?**

21  A   That would sound about right.

22  Q   **And during those approximately six years as the claims**

23      **manager, would every adjustor who had a livestock theft**

24      **claim have to run that by you if they were denying**

25      **coverage?**

| | | |
|---|---|---|
| 1 | A | They would start with me, yes. |
| 2 | Q | **Tell me what you mean by that.** |
| 3 | A | Well, I report to Kevin McCoy in Des Moines. |
| 4 | Q | **Would that be true for every livestock theft claim** |
| 5 | | **denial?** |
| 6 | A | Yes. |
| 7 | Q | **That the adjustor would contact you and you contact Kevin** |
| 8 | | **McCoy?** |
| 9 | A | Yes. |
| 10 | Q | **What's the reason for that?** |
| 11 | A | Oversight.  More eyes.  Make sure we're doing it |
| 12 | | correctly. |
| 13 | Q | **And then my understanding of the limits of authority for** |
| 14 | | **your adjustors is that you would then write the denial** |
| 15 | | **letter.  Is that correct?** |
| 16 | A | I -- if they were versed in drafting the initial |
| 17 | | disclaimer, it would come to me, I would approve it, and |
| 18 | | then we would set it up in front of Kevin or others to |
| 19 | | decide any edits that would be necessary. |
| 20 | Q | **Did you have a standard form that you used in** |
| 21 | | **South Dakota?** |
| 22 | A | No. |
| 23 | Q | **Had you drafted other denial letters --** |
| 24 | A | Yes. |
| 25 | Q | **-- on policies -- okay.  Hang on.  I got to finish my** |

1     question.

2  A  I'm sorry.

3  Q  **I paused and made it complicated.  Do you believe that**

4     **you drafted other denial letters for Farm Bureau**

5     **Insurance who did have that policy module in their**

6     **policy, PKSD.MSCHP.0508?**

7  A  I don't recall any specific cattle loss denials in that

8     time frame involving similar facts.  So I can't answer

9     yes or no.  I don't recall.

10  Q  **Now, that was not my question.  Would other customers of**

11     **Farm Bureau have had that provision as part of their**

12     **policy?**

13  A  Depending on how they insured their livestock, yes.

14  Q  **Your testimony is that that's an actual policy provision**

15     **somewhere in the Farm Bureau universe?**

16  A  Yes, it is.

17  Q  **As a state claims manager for South Dakota, did you have**

18     **access to lists or accounts or evaluations of the types**

19     **of claims that were being handled by your claims**

20     **managers?**

21  A  I'm sorry, I don't quite understand that question.

22  Q  **Okay.  Let me -- maybe I'll just jump ahead.  Do you have**

23     **a way in the Farm Bureau system to look up livestock**

24     **theft cases that you would have handled during that time**

25     **frame?**

18

```
 1   A   Not me personally.  I don't know what master list might
 2       capture that data.  I do not have access to that.
 3   Q   Does the claim file record losses in a certain way when
 4       it's cattle theft?
 5   A   I don't know, but I would have to believe there is some
 6       potential for that.  I don't -- I just don't know.
 7   Q   Is one of the reasons that you believe that is because
 8       that's how underwriting would know if it's doing its job
 9       right?
10   A   No.  I -- I don't do underwriting.
11   Q   During the six-year span that you were the claim manager
12       for South Dakota, do you have an estimate of how many
13       cattle theft cases came across your desk?
14   A   No.
15   Q   Would it be more than 10,000?
16   A   Cattle claim losses?
17   Q   Correct.
18   A   I would say in the six years that I was claim manager, we
19       handled a total of -- and I'm -- I'm speculating
20       somewhat, around 50,000 claims total, with the largest
21       majority being storm-related claims.
22   Q   And so 10,000 cattle theft claims would be too high for
23       that six-year time period?
24   A   Oh, that would be too high in my entire career.
25   Q   During that six-year time frame, you think you had more
```

1     than 500 cattle theft claims?

2  A  No.

3  Q  More than a hundred?

4  A  No.

5  Q  More than 50?

6  A  No.

7  Q  More than 10?

8  A  I would say that might be closer to the number.

9  Q  And we're talking about cattle theft claims that you

10     would have overseen as a manager during that six-year

11     time period from 2010 to 2016?

12  A  Correct.

13  Q  In your prior role as an adjustor -- would that be

14     accurate to describe what you were?

15  A  Yes.

16  Q  How many cattle theft claims came across your desk?

17  A  Let's see, in the course of 17 years of field work,

18     probably a dozen.

19  Q  And if I put those numbers together, 17 years, 12, six

20     years with ten, understanding that these are estimates,

21     over 23 years, you think you handled somewhere around 22

22     cattle theft claims?

23  A  I would only be speculating, but to my recollection,

24     that's a fair number.

25  Q  Okay.  Do you recall how many cattle theft claims you

1      would have approved for coverage?

2   A  I recall paying more than denying.  I think I probably

3      only denied less than a half a dozen.

4   Q  **Are you familiar with what protocols or systems are in**

5      **place at Farm Bureau to make sure the claims are handled**

6      **accurately?**

7   A  Yes.

8   Q  **What are those?**

9   A  Best practices and review by management, supervisors.

10  Q  **And what are the best practices?**

11  A  They're guidelines for claims handling from auto,

12     property, casualty.

13  Q  **And they're best practices for cattle theft claims?**

14  A  I don't have best practices committed to memory, but

15     there would be references in there on how to handle a

16     claim involving a certain dollar value, and certainly a

17     cattle claim would probably meet that threshold.

18  Q  **And do those best practices include using the correct**

19     **policy provisions?**

20  A  Correct.

21  Q  **Are you familiar with any protocols that are in place to**

22     **make sure that Farm Bureau's adjustors are actually using**

23     **the correct portions of the policy?**

24  A  Yes.

25  Q  **What protocols or rules are those?**

1   A   Review by management.

2   Q   **And who is management?**

3   A   Well, it would be the state claim manager and Kevin

4       McCoy.

5   Q   **And so when the state claim manager is the one making the**

6       **decision, then it would be Kevin McCoy's job to -- to**

7       **review your work?**

8   A   Kevin would critique my work.  Whether he roundtables it

9       with anybody else would be up to him.

10  Q   **And what's Kevin's job title?**

11  A   Property claim manager.

12  Q   **And was he in that role in 2014 and '15?**

13  A   Yes.

14  Q   **Would he be your supervisor at that point in time in**

15      **2015?**

16  A   I don't know if it's fair to say he's a supervisor as

17      much as if you have a coverage determination for

18      property, you would take it to him.  Equally there's

19      managers that would review casualty.  So it's a

20      specialization.

21  Q   **The difference between casualty and -- what did you say**

22      **Kevin was?  He was a --**

23  A   Property claim manager.

24  Q   **Difference between property and casualty is what?**

25  A   Well, casualty would be your auto accidents and liability

| | | |
|---|---|---|
| 1 | | claims.  Property is just what it references, property. |
| 2 | Q | **Casualty would be Mr. Petrik?** |
| 3 | A | Yes. |
| 4 | Q | **What would Mr. Petrik's role be on a claim like this** |
| 5 | | **involving --** |
| 6 | A | Charles would -- |
| 7 | Q | **-- cattle theft?** |
| 8 | A | -- would be, as I referenced the additional person with |
| 9 | | the contract knowledge and the experience to make sure |
| 10 | | that we do things appropriately and correctly. |
| 11 | Q | **And so would you have provided a copy of your -- your** |
| 12 | | **letter, your February 2015 letter, to both Charles and to** |
| 13 | | **Kevin?** |
| 14 | A | Yes. |
| 15 | Q | **And they both would have reviewed it?** |
| 16 | A | Yes. |
| 17 | Q | **And they both would have had to have approved it for you** |
| 18 | | **to send it out?** |
| 19 | A | Yes. |
| 20 | Q | **Would you say that you report to either one of those two** |
| 21 | | **at that point in time or do you report to somebody else?** |
| 22 | A | Yes.  I -- I would say that in the hierarchy of Farm |
| 23 | | Bureau, they're what's called shared services.  They are |
| 24 | | in a different department in Des Moines.  And the claim |
| 25 | | managers in any state would report these types of claims, |

1  coverage denials, serious claims, to the appropriate

2  manager, whether it's property or casualty, and they

3  would provide oversight.

4 Q **So for particular claims, they would -- you would report**

5  **to them on claims?**

6 A Yes.

7 Q **In the hierarchy, is there someone that you then report**

8  **to administratively that's your boss?**

9 A Administratively in South Dakota would have been D.J.

10  Wittrock.  He was the business center director.

11 Q **And that's based out of Sioux Falls?**

12 A Yes.

13 Q **Do you know what the duties are of the business center**

14  **director?**

15 A Well, D.J.'s duties would have included underwriting and

16  marketing and he would have been involved in property/

17  casualty, but not on a daily basis.  It's -- I would not

18  have been obligated to taking a claim question or report

19  to him.  It would have been going either to Charles or

20  Kevin.

21 Q **And so his function is -- is more just managing the**

22  **business side of things?**

23 A Yes.

24 Q **In his role managing the business side of things in the**

25  **South Dakota territory, did he discuss concepts like loss**

1     ratio with you?

2  A  Yes.

3  Q  **And did he track the loss ratios for South Dakota?**

4  A  Yes.

5  Q  **Did you have goals about the loss ratios for**

6     **South Dakota?**

7  A  At his level, he would have had a goal.  In my level I

8     don't get so much concerned or involved with that.  A

9     claim is what a claim is.

10  Q  **Did Mr. Petrik or Mr. McCoy have an interest in loss**

11     **ratios?**

12  A  I can't answer that question as to what their specific

13     responsibilities were.  Would they have an interest in

14     it?  I think anybody in the insurance business has a, you

15     know, an interest in the loss ratio.  It's a measurement

16     number.  So to say that he had no interest, I -- that

17     would probably not be true.  But I don't understand that

18     they would have had any goal setting loss ratio.  They

19     were never -- they never expressed that to me.

20  Q  **Is it accurate that you were the South Dakota claims**

21     **manager during the time that Jim Brannen became CEO of**

22     **Farm Bureau?**

23  A  Yes.

24  Q  **And following his installation as the CEO, did you notice**

25     **a change in how Farm Bureau operated?**

1   A   No.

2   **Q   Did you notice a change in how claims were handled?**

3   A   No.

4   **Q   Did you notice a change in goals or other numbers that**

5   **the company was looking at?**

6   A   No.

7   **Q   Is your position salaried or is there a bonus**

8   **associated --**

9   A   Salary.

10  **Q   So there's no bonus at all?**

11  A   No bonus at all.

12  **Q   And so your -- your salary is just dependent upon your**

13  **showing up to work?**

14  A   Well, I suppose I have to do my job.

15  **Q   And -- and doing your job?**

16  A   Yes.

17  **Q   And people above you are -- are bonused and have other**

18  **incentives?**

19  A   I don't have any access to what they get paid.  I haven't

20  a clue.

21  **Q   Are you familiar that levels above you are positions that**

22  **involve bonuses?**

23  A   I pretty much worry about Jim DeFea and the things he's

24  responsible for.  I don't worry about Jim Brannen or the

25  people at his level.

1   Q  **I understand that on a day-to-day basis you're not**

2      **worried about that.  My question is are you aware that**

3      **employees above you are compensated with bonuses?**

4   A  I don't know if they are or if they are not.  I don't

5      look at that.  I don't pay any attention to that.

6   Q  **People above you like D.J. Wittrock were concerned about**

7      **the loss ratio?**

8   A  I would have to believe that's D.J.'s responsibility,

9      profitability and rating, marketing.

10  Q  **And it was your understanding that loss ratio is**

11     **connected to profitability?**

12  A  Of course is it, yes.

13  Q  **Why is that?**

14  A  Well, if we want to remain competitive in this business,

15     we have to some checks and balances enforced to be

16     competitive in the rate world.  There's a lot of

17     different carriers in this state, and if we pay every

18     claim at whatever anybody asks and pay no attention to

19     expenses, we wouldn't be here very long.  The rest of our

20     competitors would, through a variety of different

21     mechanisms, remove us from this marketplace.

22  Q  **Has the market gotten more competitive in recent years?**

23  A  Oh, I -- I'm sure it has.

24  Q  **Would you agree then that the pressure on profitability**

25     **has increased in recent years?**

| | | |
|---|---|---|
| 1 | A | I can't imagine that the pressure on profitability hasn't |
| 2 | | affected every carrier out there, but I don't see how it |
| 3 | | couldn't. |
| 4 | Q | **Do you have an estimate of the time frame of when you** |
| 5 | | **think that started to happen?** |
| 6 | A | Probably when interest rates changed. |
| 7 | Q | **And would that mean post-2008?** |
| 8 | A | Oh, I would say long before that.  You know, we used to |
| 9 | | make more money on return on investment, which obviously |
| 10 | | makes permissible loss ratios and expenses not as much of |
| 11 | | a factor, and that along with just more competition, |
| 12 | | that's the environment. |
| 13 | Q | **I'm trying to pin down when the interest rates would have** |
| 14 | | **changed just from my memory.  Would that be 2000 then?** |
| 15 | A | Well, I know in the '80s you could make 14 percent, and |
| 16 | | we've gradually got down to two percent.  So it's been |
| 17 | | the same effect for everyone.  I'm not an economist. |
| 18 | Q | **No, but you've been in the business for 40 --** |
| 19 | A | 40 years. |
| 20 | Q | **-- years?** |
| 21 | A | Yes. |
| 22 | | MR. BRENDTRO:  Let's take a quick break. |
| 23 | | THE WITNESS:  Thank you.  Better go put some money in |
| 24 | | the meter. |
| 25 | | (Recess at 4:12 p.m.) |

1    MR. BRENDTRO:  Mr. DeFea, I have no further questions

2  for you.

3    THE WITNESS:  Okay.

4    MR. ARNDT:  Okay.  Jim, you have got a right to

5  review your deposition transcript before it would become

6  certified.  I'm going to recommend that you take that

7  opportunity, that Kerry send you a copy of the transcript

8  and you review it for any corrections or clarifications

9  that you would want to make.  Is that okay?

10    THE WITNESS:  Yes, it is.

11    MR. ARNDT:  Okay.  So, Kerry, if you could send us an

12  errata sheet and the transcript, I'll get it to Jim.

13    THE REPORTER:  Okay.

14  (Witness excused at 4:23 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF SOUTH DAKOTA      )
                                :        CERTIFICATE
 2   COUNTY OF MINNEHAHA        )

 3

 4        I, Kerry Lange, Court Reporter and Notary Public, do

 5   hereby certify that the witness was first duly sworn by me to

 6   testify to the truth, the whole truth, and nothing but the

 7   truth relative to the matter under consideration; that the

 8   reading and signing of the deposition was not waived by the

 9   witness for reasons as hereinbefore stated; that the

10   foregoing pages 1 - 28, inclusive, are a true and correct

11   transcript of my stenotype notes.

12        I further certify that I am not a relative or employee

13   or attorney or counsel of any of the parties or a relative or

14   employee of such attorney or counsel, and that I am not

15   financially interested in this action.

16        In testimony whereof, I have hereto affixed my signature

17   this 17th day of June, 2019.

18
                          _Kerry Lange_
19

20                       _____
                                   Kerry Lange
21

22                       Commission Expires:  7/12/23

23

24

25
```

DAKOTAH REPORTING AGENCY
605-338-8898

1          Pursuant to the Rules of Civil Procedure, I have read

2     the foregoing pages 1 - 28, inclusive, and have noted any

3     and all changes in form or substance desired in my testimony,

4     and have signed below on the _____ day of _____, 2019.

5

6     Page & Line No.      Change in Answer      Reason for Change

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                  _____

                                              Jim DeFea

23

24    Notary Signature: _____

25    My Commission Expires: _____

DAKOTAH REPORTING AGENCY
605-338-8898

**0**

**0508** 10:14

**1**

**1** 9:17 11:10
**10** 10:20 19:7
**10,000** 18:15,22
**11th** 3:7
**12** 19:19
**14** 27:15
**15** 21:12
**17** 19:17,19
**173** 10:4,5
**19** 5:22
**1998** 14:5

**2**

**2** 8:11,18 10:12
**2000** 27:14
**2010** 15:18 19:11
**2014** 21:12
**2015** 6:17 8:9 15:18 21:15 22:12
**2016** 5:15,23 7:17 15:20 19:11
**2019** 3:8
**22** 19:21
**23** 19:21
**286** 8:11
**290** 10:12
**292** 10:16 11:3
**29th** 5:15,23 7:17

**3**

**3** 5:1

**3:30** 3:8

**4**

**4** 9:3
**40** 27:18,19
**4:12** 27:25
**4:23** 28:14

**5**

**5** 8:19 9:3 10:11 11:20 12:17
**50** 19:5
**50,000** 18:20
**500** 19:1

**6**

**6** 8:21 9:3 11:20 12:17

**7**

**7** 8:18 9:3 11:20 12:2,17
**74** 11:10

**8**

**80s** 27:15

**9**

**93** 13:16
**98** 13:16

**A**

**above-named** 3:3
**access** 17:18 18:2 25:19
**accidents** 21:25
**accordance** 3:13
**accounts** 17:18

**accurate** 5:22 6:3,20 7:1 19:14 24:20
**accurately** 20:6
**actual** 17:14
**additional** 8:18 22:8
**adjustor** 15:23 16:7 19:13
**adjustors** 14:25 16:14 20:22
**administratively** 23:8,9
**advice** 5:11
**affected** 27:2
**agree** 9:18,21 26:24
**agreed** 3:2
**ahead** 4:2,12 17:22
**alive** 6:11
**American** 13:11
**animal** 12:13
**animals** 8:19,20 9:2 12:14
**appearances** 3:4
**appears** 12:3
**applicable** 3:13 7:4 8:18
**applied** 8:5
**apply** 12:5,21 14:3
**appropriately** 22:10
**approve** 16:17
**approved** 20:1 22:17
**approximately** 15:22
**April** 15:18
**ARNDT** 4:11 7:9 28:4,11
**arrival** 15:18
**asks** 26:18
**attached** 12:18
**attempted** 10:21
**attention** 26:5,18
**attorney** 5:17 7:10

**attorneys** 3:3
**authority** 16:13
**auto** 20:11 21:25
**aware** 26:2

**B**

**back** 9:8 14:15
**bad** 4:21
**balances** 26:15
**based** 23:11
**basis** 23:17 26:1
**bodily** 14:6
**bonus** 25:7,10,11
**bonused** 25:17
**bonuses** 25:22 26:3
**boss** 23:8
**Brannen** 24:21 25:24
**break** 27:22
**BRENDTRO** 4:1,8 27:22 28:1
**Bureau** 5:8,19 6:6,19,23 7:23 8:1,3 13:6,8,12,24 14:5,6,17 17:4,11,15,23 20:5 22:23 24:22,25
**Bureau's** 6:15 13:22 20:22
**business** 10:23 14:22 23:10,13,22,24 24:14 26:14 27:18

**C**

**called** 3:24 9:25 22:23
**calls** 7:10
**capture** 18:2
**Car** 14:8
**career** 18:24
**carrier** 27:2
**carriers** 26:17

**cases**  14:8 17:24 18:13

**casualty**  13:18 20:12 21:19,21,24,25 22:2 23:2, 17

**cattle**  6:1,15 8:13 17:7 18:4,13,16,22 19:1,9,16, 22,25 20:13,17 22:7

**caused**  10:21

**center**  14:22 23:10,13

**CEO**  24:21,24

**certified**  9:18 28:6

**challenge**  7:22

**challenged**  8:1

**change**  24:25 25:2,4

**changed**  27:6,14

**Charles**  22:6,12 23:19

**checks**  26:15

**choosing**  7:12,15

**Civil**  3:14

**claim**  5:12 12:22 14:18, 22,24 15:24 16:4 18:3,11, 16,18 20:16,17 21:3,5,11, 23 22:4,24 23:18 24:9 26:18

**claims**  4:20,21 13:14,17, 18 15:2,3,5,7,8,10,13,17, 22 17:17,19 18:20,21,22 19:1,9,16,22,25 20:5,11, 13 22:1,25 23:1,4,5 24:20 25:2

**clarifications**  28:8

**class**  12:14

**closer**  19:8

**clue**  25:20

**code**  9:11

**Colonial**  13:10

**commencing**  3:8

**committed**  20:14

**company**  13:21 25:5

**compensated**  26:3

**competition**  27:11

**competitive**  26:14,16,22

**competitors**  26:20

**complicated**  17:3

**concepts**  23:25

**concerned**  3:17 24:8 26:6

**concluded**  5:20 6:19

**conclusion**  5:25 6:4,7,14 8:2

**connected**  26:11

**consideration**  9:4

**consultant**  14:22

**contact**  16:7

**context**  4:18

**contract**  22:9

**conversion**  7:5 8:5,7,15, 23 9:1 11:2 12:4,5,8

**converted**  6:1,14

**convey**  5:8

**copy**  9:9,18 22:11 28:7

**correct**  9:13 11:18,20,21 12:20,23 13:1,2,5 15:1 16:15 18:17 19:12 20:18, 20,23

**corrections**  28:8

**correctly**  16:12 22:10

**counsel**  3:17

**cover**  10:20

**coverage**  6:23 7:3,8,13, 23 8:4,12 9:4 10:22 12:14 15:25 20:1 21:17 23:1

**covered**  10:21

**crash**  14:8

**critique**  21:8

**customers**  17:10

---

**D**

**D.J.**  23:9 26:6

**D.j.'s**  23:15 26:8

**daily**  23:17

**Dakota**  3:7,10 14:15,16, 22 15:17 16:21 17:17 18:12 23:9,25 24:3,6,20

**data**  18:2

**date**  6:6,8 15:19

**day**  3:7 7:2

**day-to-day**  26:1

**December**  5:15,22,23 7:17

**decide**  16:19

**decision**  5:4,5 7:13 21:6

**Defea**  3:5,23 4:3,13 13:6 25:23 28:1

**denial**  15:12 16:5,14,23 17:4

**denials**  17:7 23:1

**denied**  20:3

**denying**  8:12 15:24 20:2

**department**  22:24

**dependent**  25:12

**Depending**  17:13

**deposition**  3:5,9,11,13 4:4,9,14 28:5

**Des**  16:3 22:24

**describe**  19:14

**desk**  18:13 19:16

**determination**  6:23 7:23 21:17

**difference**  21:21,24

**direct**  10:20

**director**  23:10,14

**disappearance**  8:23,25 10:24

**disclaimer**  16:17

**disclosed**  10:25

**discovery**  3:11

**discuss**  23:25

**discusses**  10:18

**discussions**  5:7

**disputes**  4:18,20

**dollar**  20:16

**dozen**  19:18 20:3

**drafted**  16:23 17:4

**drafting**  15:12 16:16

**Drew's**  15:18

**duly**  3:24

**duties**  13:13 23:13,15

---

**E**

**economist**  27:17

**edits**  16:19

**effect**  27:17

**else's**  5:4

**embezzlement**  8:24

**employees**  8:19 26:3

**endorsements**  11:6,12, 15

**enforced**  26:15

**entire**  18:24

**entrusted**  8:20

**environment**  27:12

**Equally**  21:18

**errata**  28:12

**Escape**  8:22

**essentially**  14:24

**estimate**  15:15 18:12 27:4

**estimates**  19:20

**evaluate**  5:11

**evaluations**  17:18

**Evans**  3:6

**evidence**  9:1 10:25

**exact**  14:7 15:19

**EXAMINATION** 4:1

**exclusion** 7:5 8:5,7,8,10, 16 11:2 12:2,4,5,8

**exclusions** 7:3,14 8:18 10:16 12:16,21

**excused** 28:14

**Exhibit** 5:1 8:11 9:17 10:12 11:10

**exists** 12:8

**expenses** 26:19 27:10

**experience** 15:2 22:9

**explanation** 11:24

**expressed** 24:19

**extensively** 11:19

**extent** 7:9

**eyes** 16:11

---

**F**

**facilitate** 5:7

**factor** 27:11

**facts** 6:20 14:3 17:8

**fair** 13:3 19:24 21:16

**faith** 4:21

**Falls** 3:7 23:11

**familiar** 5:14 20:4,21 25:21

**Family** 13:11

**FAPR** 3:9

**Farm** 5:8,19 6:6,15,19,22 7:22 8:1,3 13:6,8,12,22,24 14:5,6,17 17:4,11,15,23 20:5,22 22:22 24:22,25

**farm/ranch** 10:13,22

**farmers** 15:13

**FB0289** 10:19

**FB0290** 9:8

**FB288** 10:18

**February** 6:16 8:9 22:12

**field** 13:14 14:18 19:17

**file** 18:3

**find** 9:5 10:2

**finish** 16:25

**force** 9:22

**form** 3:15 11:7,8 12:1,18 16:20

**forms** 11:5,12,15

**found** 9:2

**frame** 17:8,25 18:25 27:4

**Fritz** 5:2,6,11,19 7:7

**Fritz's** 6:22 7:11 8:2

**front** 16:18

**full** 9:9

**function** 13:21 14:16 23:21

---

**G**

**give** 5:11

**goal** 24:7,18

**goals** 24:5 25:4

**gradually** 27:16

**Gregerson** 6:10,12 8:9 9:14,19

**Gregersons** 11:23 12:25 13:3

**Gregersons'** 5:17 6:1,15 9:17 11:14 12:12,22

**guidelines** 20:11

---

**H**

**Haigh** 3:6

**half** 20:3

**handle** 15:3 20:15

**handled** 17:19,24 18:19 19:21 20:5 25:2

**handling** 20:11

**Hang** 4:6 16:25

**happen** 13:4 27:5

**hereinabove** 3:4

**hierarchy** 22:22 23:7

**high** 18:22,24

**Hinton** 3:7

**hired** 5:11

**hiring** 5:2,6

**Holloway** 5:7,9,15,17

**hour** 3:8

**hundred** 19:3

---

**I**

**imagine** 27:1

**improper** 12:21,24

**incentives** 25:18

**include** 20:18

**included** 12:19 23:15

**including** 11:20 15:10

**increased** 26:25

**Infidelity** 8:19

**initial** 16:16

**injury** 14:6

**installation** 24:24

**insurance** 4:18,20 13:9 17:5 24:14

**insured** 17:13

**intended** 8:17

**intent** 7:12,15

**interest** 24:10,13,15,16 27:6,13

**inventory** 11:1

**investigation** 5:20,25 6:19

**investment** 27:9

**involve** 13:19 25:22

**involved** 5:2 23:16 24:8

**involving** 4:20 17:8

**20:16 22:5

**Iowa** 14:6,13

**items** 9:2

---

**J**

**Jim** 3:5,23 4:3,4,13,14 24:21 25:23,24 28:4,12

**job** 5:8 13:8,13 18:8 21:6, 10 25:14,15

**joint** 5:5

**July** 15:20

**jump** 17:22

**June** 3:8

---

**K**

**Karl** 5:25 6:14

**Kerry** 3:9 28:7,11

**Kevin** 16:3,7,18 21:3,6,8, 22 22:13 23:20

**Kevin's** 21:10

**knowledge** 22:9

**Knutson** 6:1,14

---

**L**

**Lange** 3:9

**language** 7:19

**languaged** 12:16

**largest** 18:20

**Leonard** 6:10,16 8:9,12

**letter** 5:14,19 6:9,20,22 7:7,16,19 8:9,11 9:5 10:11,12,16 11:19 12:3 16:15 22:12

**letters** 15:12 16:23 17:4

**level** 24:7 25:25

**levels** 25:21

**liability** 21:25

**limits** 16:13

list 11:5 18:1

listed 9:3 10:16 11:14 12:16

listing 11:12

lists 17:18

livestock 13:19 15:3,8, 10,13,23 16:4 17:13,23

long 6:20 13:6,15 14:10, 19 15:17 26:19 27:8

losing 10:23

loss 8:13 9:22 10:19,20, 22 17:7 23:25 24:3,5,10, 15,18 26:7,10 27:10

losses 18:3,16

lot 26:16

**M**

made 6:6,23 7:23 17:3

maintain 7:2

majority 18:21

make 16:11 20:5,22 22:9 27:9,15 28:9

makes 27:10

making 21:5

malpractice 4:21

managed 14:25

management 20:9 21:1, 2

manager 14:24 15:3,7, 17,23 17:17 18:11,18 19:10 21:3,5,11,23 23:2 24:21

managers 17:20 21:19 22:25

managing 23:21,24

Mark 4:10

market 26:22

marketing 23:16 26:9

marketplace 26:21

master 18:1

material 11:7

Mccoy 16:3,8 21:4 24:10

Mccoy's 21:6

meaning 12:3 14:25

measurement 24:15

mechanisms 26:21

meet 20:17

memory 20:14 27:14

meter 27:24

mindset 7:11

Minnesota 14:17

minutes 10:2

misplacing 10:24

misrepresent 12:24

misrepresented 11:22

missing 11:9

module 9:8,9,11,14,17,24 10:1,6 17:5

Moines 16:3 22:24

money 27:9,23

moved 14:15

multi-line 13:14,18

mysterious 8:23,25 10:24

**N**

named 10:19

Nationwide 13:10

nonetheless 11:19

Notary 3:9

noted 3:4

notice 3:15 24:24 25:2,4

number 8:19,21 19:8,24 24:16

numbers 19:19 25:4

**O**

object 7:9

Objections 3:15

obligated 23:18

offices 3:6

operated 24:25

opinion 8:3

opportunity 28:7

order 10:3

oversee 15:7

overseen 19:10

oversight 16:11 23:3

**P**

p.m. 3:8 27:25 28:14

Pages 11:20 12:17

paid 25:19

Paragraph 8:18

part 6:22 8:17 11:17 12:22 13:21 17:11

participate 15:12

parties 3:3

passed 6:12

Patty 8:9,12

paused 17:3

pay 26:5,17,18

paying 20:2

people 25:17,25 26:6

percent 27:15,16

period 18:23 19:11

permissible 27:10

person 22:8

personal 9:7 10:1,13,22, 23

personally 18:1

persons 8:20

Petrik 22:2 24:10

Petrik's 22:4

phone 6:16

physical 10:20

pin 27:13

PK 10:9

PKSD.MFRP.508 10:14

PKSD.MFRPP.508. 10:10

PKSD.MSCHP.0508 9:12,25 10:6,12,17 11:14 17:6

PKSD.MSCHP.0508. 11:4

PKSD.SPROP.0508 10:18

PKSD.SPROP.508. 10:7

place 3:6 7:14 20:5,21

point 21:14 22:21

pol 12:12

policies 16:25

policy 6:24 7:24 9:5,9,14, 15,18,19,22 10:5 11:5,7, 12,15,17,22 12:3,9,12,16, 17,18,19,22,24,25 13:24 14:1,3 17:5,6,12,14 20:19, 23

portions 20:23

position 5:8 6:15 7:2 13:13,15 14:12 25:7

positions 25:21

post-2008 27:7

potential 18:6

practices 13:22 20:9,10, 13,14,18

pressure 26:24 27:1

pretty 25:23

prior 13:8 15:2 19:13

Procedure 3:14

**profitability** 26:9,11,24 27:1

**property** 9:8,11 10:1,9, 14,21,23 12:6,8 13:18 20:12 21:11,18,23,24 22:1 23:2,16

**protocols** 20:4,21,25

**provide** 23:3

**provided** 9:9 22:11

**provision** 17:11,14

**provisions** 11:22 12:24 14:3 20:19

**Public** 3:10

**purpose** 3:11 5:6

**purposes** 3:12

**pursuant** 3:14

**put** 19:19 27:23

---

**Q**

**question** 3:16 12:7 17:1, 10,21 23:18 24:12 26:2

**questions** 4:9 28:1

**quick** 27:22

**quoted** 11:19

---

**R**

**rate** 26:16

**rates** 27:6,13

**rating** 26:9

**ratio** 24:1,15,18 26:7,10

**ratios** 24:3,5,11 27:10

**read** 13:24

**reading** 3:17

**reask** 4:9

**reason** 16:10

**reasons** 18:7

**recall** 17:7,9 19:25 20:2

**received** 9:10

**recent** 26:22,25

**recess** 27:25

**recollection** 19:23

**recommend** 28:6

**record** 3:4 18:3

**reference** 10:19

**referenced** 9:25 12:1 22:8

**references** 9:7 20:15 22:1

**refers** 9:14

**relied** 8:22

**relying** 8:8,15

**remain** 26:14

**remember** 4:24

**remove** 26:21

**rep** 13:14 14:18

**report** 16:3 22:20,21,25 23:4,7,18

**REPORTER** 28:13

**reserved** 3:16

**responsibilities** 24:13

**responsibility** 26:8

**responsible** 25:24

**rest** 26:19

**return** 27:9

**review** 7:16 20:9 21:1,7, 19 28:5,8

**reviewed** 22:15

**Reviewing** 10:3,9,18 11:8

**RMR** 3:9

**role** 14:5,19,21,23,24 15:7 19:13 21:12 22:4 23:24

**roundtables** 21:8

**rules** 3:14 20:25

**run** 15:24

---

**S**

**salaried** 25:7

**salary** 25:9,12

**schedule** 10:1

**scheduled** 9:7 10:13 12:5,8,13,14

**section** 10:9

**send** 22:18 28:7,11

**senior** 13:14,17 14:18

**services** 22:23

**set** 16:18

**setting** 24:18

**shared** 22:23

**sheet** 28:12

**shortage** 10:25

**showing** 10:7 25:13

**side** 23:22,24

**signing** 3:17

**similar** 17:8

**Sioux** 3:7 23:11

**sir** 7:6 9:16

**six-year** 18:11,23,25 19:10

**sound** 15:20,21

**South** 3:7,10 14:15,16,22 15:17 16:21 17:17 18:12 23:9,25 24:3,6,20

**span** 18:11

**specialist** 14:7

**specialization** 21:20

**specific** 6:8 17:7 24:12

**specifically** 12:13

**speculating** 18:19 19:23

**speculation** 7:10

**spoke** 6:16

**staffer** 13:17

**standard** 16:20

**start** 16:1

**started** 4:8 13:12 27:5

**starts** 10:4

**state** 3:10 4:2,12 17:17 21:3,5 22:25 26:17

**statement** 5:22 6:3 7:1, 22

**states** 5:19

**stipulated** 3:2

**storm-related** 18:21

**strike** 6:13

**supervisor** 21:14,16

**supervisors** 20:9

**suppose** 25:14

**sworn** 3:24

**system** 17:23

**systems** 20:4

---

**T**

**taking** 10:25 23:18

**talk** 7:19

**talking** 11:2 19:9

**taught** 13:24 14:1,3

**telling** 10:15

**ten** 13:10 14:20 19:20

**territory** 23:25

**testified** 3:25

**testimony** 12:2,7 17:14

**theft** 10:20,21 15:5,10,13, 23 16:4 17:24 18:4,13,22 19:1,9,16,22,25 20:13 22:7

**things** 22:10 23:22,24 25:23

**threshold** 20:17

**time** 3:6,16 6:16 7:16 9:22 17:8,24 18:23,25 19:11 21:14 22:21 24:21 27:4

**times** 4:6,16

**title** 14:7 21:10

**Tom** 5:2

**Tom's** 7:12,15

**total** 18:19,20

**track** 24:3

**trained** 13:22

**transcript** 3:18 28:5,7,12

**trial** 3:12,16

**triggered** 9:3

**true** 16:4 24:17

**turn** 8:11 9:17,21,24 11:10

**Twenty-five** 13:7

**types** 17:18 22:25

**typo** 11:24,25

---

**U**

**understand** 17:21 24:17 26:1

**understanding** 16:13 19:20 26:10

**underwriting** 18:8,10 23:15

**universe** 17:15

---

**V**

**variety** 26:20

**verbiage** 7:13

**versed** 16:16

**video** 4:10

---

**W**

**waived** 3:18

**Wittrock** 23:10 26:6

**words** 7:15

**work** 19:17 21:7,8 25:13

**worked** 13:6,10,11 14:17

**working** 13:8

**world** 26:16

**worried** 26:2

**worry** 25:23,24

**write** 7:7 16:14

**written** 3:14

**wrongful** 8:23

**wrote** 8:12

---

**Y**

**years** 13:7,10,11 14:13,20 15:22 18:18 19:17,19,20, 21 26:22,25 27:19,20