UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| PATRICIA GREGERSON,<br><br>                    Plaintiff,<br><br>      vs.<br><br>FARM BUREAU PROPERTY AND<br>CASUALTY INSURANCE COMPANY,<br><br>            Defendant. | CIV. 18-5044-JLV<br><br>ORDER |

## INTRODUCTION

Plaintiff Patricia Gregerson brought this diversity action, both individually and on behalf of the estate of her late husband, Leonard Gregerson, alleging defendant Farm Bureau Property and Casualty Insurance Company breached an insurance contract and processed her claim in bad faith.[1]  (Docket 1).   The parties filed cross-motions for summary judgment.   Plaintiff moves for partial summary judgment on her breach of contract claim.   (Docket 23).   Defendant moves for summary judgment on plaintiff's breach of contract and bad faith claims.   (Docket 29).   The court grants summary judgment to defendant in part on the breach of contract claim, but otherwise concludes genuine questions of material fact remain for trial.

_____

[1]Because the court is sitting in diversity, South Dakota substantive law governs.   O'Neal v. Remington Arms Co., L.L.C., 817 F.3d 1055, 1060 (8th Cir. 2015).

# I.  Facts

This factual recitation is derived from each party's statement of undisputed material facts and the supporting record materials.   (Dockets 24, 26, 32, 32, 34 & 35).   The court views these facts in the light most favorable to plaintiff, as the nonmoving party on the bad faith claim.   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

## A.   Cattle theft

Plaintiff operates a ranch near Fairburn, South Dakota.   (Docket 31 at ¶ 1).   She currently maintains approximately 400 head of cattle, with the assistance of her son, Kyle Gregerson.   (Docket 26-1 at p. 7).   Each year, plaintiff summers "a large portion" of her herd away from her ranch at other pastures.   Id. at pp. 20-21.   In 2014, plaintiff arranged with Karl Knutson to care for approximately 135 pregnant cows during the spring and summer of that year at his family ranch in Vale, South Dakota.[2]   Id. at pp. 23-24, 27.   Mr. Knutson was friends with Kyle Gregerson.   Id. at p. 26.   Plaintiff considered Mr. Knutson an experienced rancher.   Id. at p. 24.   Mr. Knutson was willing to take the cows in the early spring "and calve them out for a very, very decent price."   Id. at p. 24.   The Gregersons "thought [they] had stepped on a gold mine[.]"   Id.   They "never heard a bad thing" about Mr. Knutson and "thought that this would

---

[2]Plaintiff objects to facts surrounding her arrangement with Mr. Knutson as irrelevant.   (Docket 34 at ¶¶ 3-10).   The court finds relevant all facts it recites in this order.   Any objection on relevance grounds is overruled.

2

be a good deal." Id.   The Gregersons and Mr. Knutson did not reduce their arrangement to writing. Id. at p. 33.

The Gregersons became suspicious of Mr. Knutson as 2014 progressed. Before they delivered their cows to Mr. Knutson, they asked if he carried insurance. Id. at p. 31.   He showed them a paper that "wasn't actually an insurance policy" and refused to let them photograph it. Id.   The Gregerson men wanted to check on their cows, but Mr. Knutson made excuses to prevent their visits. Id. at p. 35.   Plaintiff's daughter Kaycie Gregerson heard Mr. Knutson had been telling others he had 11 sets of twin calves, which she and plaintiff found outlandish.   (Dockets 26-1 at p. 37 & 26-3 at p. 4).   At some point while Mr. Knutson had possession of the cows, Ms. Gregerson investigated his background and found he had "prior arrests" and that people "had made actual complaints" about him in relation to livestock issues.   (Docket 26-1 at p. 53).

According to a letter from Leonard Gregerson to defendant, Mr. Knutson shot one of the approximately 135 pregnant cows in February 2014 because it was injured.   (Docket 26-4 at p. 65).   In March, Mr. Knutson told the Gregersons that five of the cows lost their calves. Id.   The Gregersons took the five cows back to their ranch. Id.   On May 29, Mr. Knutson, the Gregersons and others branded approximately 125 calves.[3]   (Docket 26-3 at p. 2).   With

---

[3]In the complaint, plaintiff alleges they branded 127 calves, but Ms. Gregerson's e-mail and Mr. Gregerson's letter both state they branded 122. (Dockets 1 at ¶ 10, 26-3 at p. 2 & 26-4 at p. 66).

approximately 129 pregnant cows in Mr. Knutson's custody, Mr. Gregerson believed there should have been more calves.   (Docket 26-4 at p. 66).   Mr. Knutson claimed "he still had a few cows up at the calving pasture."   Id. According to an e-mail summary authored by Ms. Gregerson, Mr. Knutson hauled the calves to the branding site, preventing "an accurate count of the precise head of cattle."   (Docket 26-3 at p. 2).

On September 15, according to Ms. Gregerson's e-mail, the Gregerson men, Mr. Knutson and others vaccinated the cattle.   (Docket 26-3 at p. 3).   The Gregersons believed "quite a few" of their cattle were missing during the vaccination.   (Docket 26-1 at p. 26).   They returned on September 22 to search for the missing cattle.   (Docket 26-3 at p. 3).   Mr. Knutson said he would hire a pilot to conduct an aerial search for the cows, which he thought could be hiding in treed areas.   Id.   The Gregersons found this odd, since the Knutson land "is pretty flat" with "almost no trees" and "no deep gulleys or treed areas where cattle could get lost[.]"   (Dockets 26-3 at p. 3 & 26-4 at p. 66).   On October 4, the Gregersons returned to Mr. Knutson's land without him present to search for the cattle.   (Docket 26-3 at p. 3).   Kyle Gregerson and two friends searched the area and surrounding pastures on four-wheelers.   (Docket 26-4 at p. 66).   Plaintiff estimated they searched 20-30,000 acres.   (Docket 26-1 at p. 62).   They found no cattle, downed fences or carcasses.   Id.

On October 9, the Gregersons retrieved their remaining cattle, 113 cows and 95 calves in all.   (Dockets 26-3 at p. 4 & 26-4 at p. 66).   They believed they

should have had 129 cows and at least 122 calves, so they calculated a loss of 16 cows and 27 calves.   Id.   On October 30, the Gregersons reported their cattle as stolen to the Meade County Sheriff's Office.[4]   (Docket 26-4 at p. 143).   The Gregersons believed Mr. Knutson stole the cattle.   (Docket 26-1 at p. 36).   After making their police report, they learned other suspicious information about Mr. Knutson.   Mr. Knutson's hired man told them Mr. Knutson had been claiming they sold him the cattle.   (Docket 26-4 at p. 67).   Another rancher, Karen Bryan, claimed Mr. Knutson reneged on an agreement to pasture her cattle.   Id. Leonard Gregerson reported they "heard about a lot of other shady deals [Mr. Knutson] got into" but did not provide further details.   Id.

On May 19, 2015, Mr. Knutson was indicted for lying to the federal government in a matter unrelated to this case.   United States v. Knutson, CR. 15-50064 (Docket 2) (D.S.D. May 19, 2015).   He pled guilty, admitting to falsely claiming in an application for federal disaster aid that he lost 129 head of cattle in a blizzard.   Id. at Dockets 24 & 26 (D.S.D. Oct. 28, 2015).

---

[4]Defendant asserts Mr. Knutson was never charged with any crime related to the alleged theft, but does not support that assertion with record evidence. (Docket 31 at ¶ 15).   Plaintiff stated in her deposition that an officer told her they had insufficient evidence to charge Mr. Knutson.   (Docket 26-1 at pp. 56-57). Plaintiff's objection that evidence of the criminal investigation into Mr. Knutson would be inadmissible at trial, see Docket 34 at ¶¶ 14-15, is addressed below. See infra Section IV.D.

### B.    Claim processing

The Gregersons held a "farm policy" with defendant.[5]   (Docket 24 at ¶ 1). The policy covered loss " 'caused by' theft or attempted theft."   (Docket 31-3). However, the theft coverage is subject to a number of exclusions.   At issue here, loss caused by "losing, misplacing, mysterious disappearance or where the only evidence of loss is a shortage disclosed upon taking inventory" is excluded.   Id.

The Gregersons filed a claim with defendant on November 21, 2014. (Docket 26-4 at pp. 124-34).   Mike Elliott, apparently an adjuster for defendant, took statements on November 24 by telephone from Leonard Gregerson and Carl Oberlitner, who loaned Mr. Gregerson the money to purchase the cattle.   Id. at pp. 107-11, 141-42, 149-58.   The statements were transcribed.   Id.   Mr. Gregerson told Mr. Elliott plaintiff discovered Mr. Knutson had "a few charges" against him.   Id. at p. 152.   He also said his son and "a bunch of his buddies" searched the area around Mr. Knutson's pasture and didn't find the cattle.   Id. at p. 153.   Mr. Gregerson noted "[t]hat many dead cattle" should have been easily located because of their smell.   Id. at p. 155.   He told Mr. Elliott they "rode a lot of that country[,] probably 25, 30,000 acres up there and never saw nothin'."   Id. at p. 156.   He believed Mr. Knutson stole the cattle.   Id. at p. 155.

According to defendant's claim notes, an adjuster left a message for Mr. Knutson on January 7, 2015, but apparently did not succeed in contacting him.[6]

---

[5]The parties only filed one page of the policy at issue.   (Docket 31-3).

[6]The claim notes do not name the adjuster.

Id. at p. 140.   On January 13, the adjuster spoke to an agent at Mr. Knutson's insurance company.   Id.   The agent reported that Mr. Knutson "ha[d] gone into hiding and [wa]s not returning phone calls."   Id.   The adjuster also spoke to officers at the Meade County Sheriff's Office multiple times.   Id. at pp. 138-40. The claim file contains a letter, dated February 3, from Investigator Christopher Williams stating that the Gregersons were not suspects in the theft but that "[t]he information that has been collected indicates other persons involved[.]"   Id. at p. 143.   On February 27, an officer advised the adjuster he believed the Gregersons were victims of "cattle rustling" but "was unable to prove it[.]"   Id. at p. 138.

On February 25, the adjuster spoke with Mr. Gregerson again.   Id.   Mr. Gregerson "agree[d]"—presumably with the adjuster—that Mr. Knutson likely "converted the livestock to his own use."   Id.   The adjuster "explained" the inventory discovery exception to coverage.   Id.   The adjuster wrote the claim "should be concluded" shortly.   Id.

Defendant first denied the Gregerson claim in a letter dated February 17. Id. at p. 52.   The letter stated, "The facts, as confirmed to date, indicate that you had turned your livestock over to a custom feeder and then notified us of a significant shortage upon the taking of an inventory on the date of the loss indicated above."   Id.   The letter reproduced the inventory discovery exception. Id. at p. 55.   Defendant sent an identical letter to the Gregersons on March 24. (Docket 26-6).

The denial letters also reproduced a policy module which was not in the policy plaintiff purchased.   See Docket 26-4 at pp. 56-58 (stating module PKSD.MSCHP.0508 is part of the Gregerson policy); Docket 26-12 at p. 21 (two modules referenced in defendant's "February 17, 2015 letter to the Gregersons . . . are not in the policy" received by counsel).   The apparently inapplicable module concerned "Additional Exclusions Applicable to Animals[.]"   (Docket 26-4 at pp. 56-58).   The module purported to exclude loss caused by "[i]nfidelity of your employees or other 'persons' to whom your animals are entrusted" as well as "wrongful conversion[.]"   Id. at p. 58.   The employee who authored the denial letter, Jim DeFea, confirmed during his deposition that the module was not part of the Gregersons' policy.   (Docket 26-5 at p. 12).   He attributed the module's inclusion in the denial letter to typographical error.   Id.

The Gregersons did not contact defendant again until May 3, 2016.   On that date, Mr. Gregerson sent a letter detailing his views on the loss, expressing a willingness to "cooperate with [the] investigation," providing witness names and contact information and asking to "get this claim paid."   (Docket 26-4 at pp. 65-68).   Mr. DeFea responded with a letter refusing to reconsider the denial. Id. at p. 62.

The Gregersons retained attorney Dan Holloway in September of 2016. (Docket 31 at ¶ 23).   He wrote a number of letters to defendant, asking for reconsideration of the denial and asserting defendant did not "say why the claim is invalid."   Docket 26-7 at p. 2; see also Dockets 26-8 – 26-11.   Defendant

hired attorney Tom Fritz to "assist . . . with the claim[.]"   (Docket 31 at ¶ 25).

"[S]ometime between December 15th and December 29th[,]" Mr. Fritz advised

defendant that a bad faith claim could be "very expensive . . . such that there's an

economic side to getting it resolved[.]"   (Docket 31-4 at pp. 2, 5).   On December

29, Mr. Fritz sent a letter to Mr. Holloway stating defendant "concluded its

investigation and made the determination that there is coverage under the

policy."  (Docket 31-5).   In his deposition, Mr. Fritz testified defendant reviewed

and approved his letter.   (Docket 31-4 at p. 3).   When he reviewed the letter in

preparation for the deposition, he found it was "erroneous."  <u>Id.</u>   He testified

that neither he nor defendant made "a determination that there is coverage

under the policy" but that they wanted to "resolve and settle the claim."  <u>Id.</u>

Mr. Holloway responded on January 5, 2017, with a letter assessing the

value of the claim at $41,040.   (Docket 31-6 at pp. 2-3).   Mr. Fritz pointed out

that Mr. Holloway was undervaluing the claim and offered a payment of $53,720.

<u>Id.</u> at p. 4.   He also asked Mr. Holloway and the Gregersons to sign a release

agreeing that the Gregersons were "fully paid and compensated for the claim and

any cause of action which the undersigned could present against Farm Bureau

arising out of or in any way related to the loss and/or theft of cattle."   (Dockets

31-6 at pp. 4-5 & 31-7).   In his letter, Mr. Fritz wrote he "attempted to artfully

craft the . . . release to include only this claim under the policy for the loss and

theft of the cattle."   (Docket 31-6 at p. 5).   He later testified that he did not

intend for the Gregersons to release any bad faith claim.   Id. at p. 4.   Mr. Holloway refused to sign the release.   Id. at p. 6.

Defendant paid the claim in checks issued on January 13, 2017.   Id. at pp. 7-8.   Leonard Gregerson passed away on February 18.   (Docket 26-2). Plaintiff—no longer represented by Mr. Holloway—filed this action on June 29, 2018.   (Docket 1).

## II.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), a movant is entitled to summary judgment if the movant can "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact exists.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).   Only disputes over facts which might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Id. at 248.   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then

summary judgment is not appropriate.  Id.  However, the moving party is entitled to judgment as a matter of law if the nonmoving party failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party.  Matsushita, 475 U.S. at 587-88 (1986).  The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

## III.  Breach of Contract

The parties cross-moved for summary judgment on plaintiff's breach of contract claim.  Plaintiff argues defendant breached the insurance contract by unreasonably delaying payment for her claim and by "misrepresenting" the policy's provisions.  (Docket 25 at pp. 20-23).  Defendant contends the delay was not unreasonable and that plaintiff failed to show she was damaged by the delay.  (Docket 30 at pp. 15, 18).  The court finds defendant is entitled to summary judgment on plaintiff's misrepresentation theory of breach, but otherwise concludes triable issues of fact exist.

11

## A.    Legal standard

"An action for breach of contract requires proof of an enforceable promise, its breach, and damages."  Stromberger Farms, Inc. v. Johnson, 2020 S.D. 22, ¶ 45 (internal quotation omitted).   "[A]n insurer should not escape liability for breach of contract when it has . . . unreasonably delayed the payment of benefits."  Bertelsen v. Allstate Ins. Co., 796 N.W.2d 685, 694 (S.D. 2011) ("Bertelsen II").   "Pursuant to SDCL 21-2-1, damages for breach of contract consist of the amount that will compensate the aggrieved party for all of the detriment caused by, and that are the likely result of, the breach."  Stern Oil Co., Inc. v. Brown, 908 N.W.2d 144, 155 (S.D. 2018) (internal quotation omitted).

## B.    Payment delay

The parties first contest whether defendant's payment delay constitutes a breach.   The Gregersons filed their theft claim on November 24, 2014, and defendant did not pay the claim until January 13, 2017.   To the court's knowledge, the policy does not establish any claim payment deadlines. Accordingly, the payment delay can constitute a breach only if some other source of law required defendant to pay the claim in a certain amount of time.   See Farm Credit Servs. of Am. v. Dougan, 704 N.W.2d 24, 28 (S.D. 2005) ("If the express language of a contract addresses an issue, then there is no need to construe intent or supply implied terms.").   The parties assert the relevant standard is whether the delay was reasonable, relying on two South Dakota Supreme Court cases.   The court finds neither case specifically on point, but

12

ultimately agrees that the reasonableness of the delay is the yardstick by which the issue of breach must be determined.   However, the court concludes reasonableness presents a triable issue of fact and denies summary judgment.

Plaintiff relies primarily on Bertelsen II.   (Docket 25 at pp. 21-22).   In that case, the South Dakota Supreme Court reviewed a jury verdict on breach of contract and insurance bad faith claims.   The insurer failed to "immediately" pay benefits, as required by statute.   Bertelsen II, 796 N.W.2d at 691-92 (citing SDCL § 62-1-1.3).   In fact, the insurer did not act on the claim for two years. Bertelsen v. Allstate Ins. Co., 764 N.W.2d 495, 501 (S.D. 2009) ("Bertelsen I"). The insureds argued the insurer was estopped from seeking subrogation for the amount of contractual damages because of this "unreasonabl[e]" delay in payment.   Bertelsen II, 796 N.W.2d at 694.   The court agreed with the principle, holding that "an insurer should not escape liability for breach of contract when it has acted in bad faith or unreasonably delayed the payment of benefits.   An insurer may thus waive the right to subrogation or be estopped from asserting it when it has unreasonably delayed the payment of benefits." Id.   However, it remanded the claim for retrial, holding that the insurers "intent in failing to pay . . . benefits is an important factor in deciding whether [it] is estopped from asserting its subrogation rights."   Id.

Defendant points to a 2018 South Dakota Supreme Court case.   (Docket 30 at p. 15) (citing Zochert v. Protective Life Ins. Co., 921 N.W.2d 479 (S.D. 2018)).   In Zochert, the insured failed to timely submit a pathology report and

13

itemized medical bills, as required under the policy.   Id. at 483-85.   This failure delayed payment of benefits.   The insured alleged the payment delay constituted bad faith.[7]   Id. at 485.   The court disagreed.   It noted a plaintiff "must demonstrate that there was an absence of a reasonable basis for the delay" and held the insurer only delayed payment because the insured failed to properly submit proof of his loss.   Id. at 490-91 (quoting McDowell v. Citicorp U.S.A., 734 N.W.2d 14, 19 (S.D. 2007)).

Neither case is wholly on point with the present matter.   There is no subrogation issue here, as in Bertelsen II, nor have the parties pointed to any statute setting a deadline for defendant to pay the claim.   Unlike in Zochert, plaintiff is offering evidence of payment delay in support of a breach of contract claim, as opposed to a bad faith claim.[8]   Nevertheless, these cases both strongly support the proposition that insurers may not unreasonably delay paying claims.

Other sources of law point in the same direction.   Plaintiff cites, without analysis, a provision of the South Dakota Unfair Trade Practices Act ("SDUTPA").   See SDCL § 58-33-67.   That statute prohibits insurers from "[f]ailing to

---

[7]The insured also raised a breach of contract claim.   However, the South Dakota Supreme Court discussed the payment delay only in the context of the insured's bad faith claim.   Zochert, 921 N.W.2d at 487-90.

[8]Breach of contract and bad faith claims are often intertwined.   Bertelsen II, 796 N.W.2d at 697 ("[A] clear breach of contract is strong evidence of bad faith[.]").   Payment delay evidence may be admissible to support plaintiff's bad faith claim at trial.   But her summary judgment briefing argues the payment delay amounts to breach of contract as a matter of law.   (Docket 25 at p. 21).   Zochert did not go so far.

acknowledge and act within thirty days upon communications with respect to claims arising under insurance policies[.]"   Id. at § 58-33-67(1).   But there is no private right of action for a violation of the SDUTPA under these circumstances. Id. at § 58-33-69.   If the court construed the SDUTPA to supply an unwritten term to the policy here permitting plaintiff to claim violation constituted a breach of contract, it would in effect create a forbidden private right of action. Nevertheless, the statute does provide some evidence of South Dakota public policy regarding an insurer's duty to promptly pay claims.

Finally, the court looks to the "implied covenant of good faith and fair dealing which prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract."   Garrett v. BankWest, Inc., 459 N.W.2d 833, 841 (S.D. 1990).   Because of this doctrine, "[a] breach of contract claim is allowed even though the conduct failed to violate any of the express terms of the contract agreed to by the parties."   Zochert, 921 N.W.2d at 487 (internal quotation omitted).   "The meaning of the covenant varies with the context of the contract."   Nygaard v. Sioux Valley Hosps. & Health Sys., 731 N.W.2d 184, 194 (S.D. 2007).   But "[t]he covenant of good faith does not create an amorphous companion contract with latent provisions to stand at odds with or in modification of the express language of the parties' agreement.   It is not a repository of limitless duties and obligations."   Dougan, 704 N.W.2d at 28.

15

The court finds an unreasonable delay in paying the Gregersons' claim for cattle theft would violate the implied covenant of good faith attached to the insurance contract.   The Gregersons purchased the policy to protect their investment in their livestock.   In the context of this insurance contract, defendant would surely not be acting in good faith or dealing fairly with plaintiff if it did in fact unreasonably delay payment on a covered claim.   <u>Bertelsen II</u>, <u>Zochert</u> and the SDUTPA all indicate insurers, as a matter of public policy, should pay claims without unreasonable delay.   Although it does not appear the policy, any statute or any case law explicitly require defendant to promptly pay meritorious claims, the court has little trouble locating that duty in the policy's implied covenant of good faith.

Having concluded defendant had an implied contractual duty to pay owed benefits without unreasonable delay, the court now turns to whether a jury question exists as to a breach of that duty.   When questions of reasonableness arise, juries are often "best equipped to resolve" them.   <u>Nicolay v. Stukel</u>, 900 N.W.2d 71, 79 (S.D. 2017) (affirming submission to jury of reasonableness question in negligence action).   And as discussed below, it is a triable question of fact whether defendant reasonably denied the Gregersons' claim.   <u>See</u> <u>infra</u> Section IV.C.   If a jury finds defendant reasonably denied the claim, it could also find the payment delay was reasonable.   If the delay was reasonable, defendant did not breach the insurance contract.

16

The parties' arguments in favor of summary judgment are unavailing. Plaintiff primarily argues defendant breached the contract by denying the claim "even though it knew their cows had been converted."[9]   (Docket 25 at p. 22). But the policy excluded coverage for thefts "where the only evidence of loss is a shortage disclosed upon taking inventory."   (Docket 31-3).   The court finds below that a jury must determine whether defendant could reasonably have relied on this exclusion in denying the Gregersons' claim.   See infra Section IV.C.   A finding that defendants knew Mr. Knutson stole the Gregersons' cattle is not a per se breach of contract.

Plaintiff also hints that an insurer has a duty to "immediately" pay covered claims, relying on the Bertelsen cases.   (Docket 25 at p. 21).   In Bertelsen I, the South Dakota Supreme Court concluded the insurer "had a contractual/statutory duty to immediately pay its benefits[.]"   764 N.W.2d at 499.   The court's holding in that case was premised on a statute requiring insurers to immediately pay benefits for bodily injury if the injury was found not to be compensable under South Dakota's workers' compensation scheme.   Id. (citing SDCL § 62-1-1.3).   The parties have not cited any statute requiring defendant to immediately pay a theft claim it believed contestable.

Defendant asserts its denial was "fairly debatable" and that its investigation was hindered by the Gregersons' failure to "provide additional

---

[9]Plaintiff argues conversion is synonymous with theft under the policy, relying on out-of-state case law.   (Dockets 25 at p. 125 n.128 & 33 at pp. 20-21). Even assuming this is true in South Dakota, it does not change the fact that the policy excluded coverage for certain thefts.

17

information or direction to conduct a further investigation[.]"   (Docket 30 at p. 15).   Even taking these assertions as true, they do not eliminate any question of fact for the jury.   They may be evidence tending to show defendant acted reasonably, but they do not conclusively prove reasonableness.   A jury could well agree with defendant on these points and still find it should have paid the claim earlier.

The court finds a jury must determine whether defendant breached the insurance contract by unreasonably delaying payment on the Gregersons' theft claim.   Summary judgment is denied on this issue.

### C.   Misrepresentation

Plaintiff also asserts defendant breached the insurance contract by misrepresenting policy terms.   (Docket 25 at pp. 22-23).   It asserts defendant "repeatedly told the Gregersons that their policy excluded theft claims when there was 'wrongful conversion.' "   Id. (quoting Docket 26-4 at p. 58).   In other words, plaintiff argues defendant purposefully recited the inapplicable animal exclusion policy module in its denial letters to trick her into thinking the policy unambiguously did not cover the loss.

Defendant did not respond to this argument.   Nevertheless, the court may not grant summary judgment simply because defendant failed to respond. Mack v. Dillon, 594 F.3d 620, 622-23 (8th Cir. 2010).   Plaintiff still bears the burden of showing the alleged misrepresentation breached the insurance

18

contract.   The court finds she did not meet that burden and grants summary judgment to defendant on this theory of breach.

Plaintiff does not allege the policy contained any provision barring misrepresentation and so defendant did not breach the policy as written.   A breach of the contract could thus only occur if some other source of law implied an anti-misrepresentation provision in the contract.

Plaintiff cites, without analysis, two cases in support of the proposition that an insurer "breaches its contractual duties when it misrepresents policy terms to its insured."   (Docket 25 at p. 22)   She first cites a Pennsylvania state trial court decision.   Id. (citing Connors v. Metro. Life Ins. Co., 35 Pa. D. & C. 4th 58 (Pa. Ct. Com. Pl. 1997)).   In Connors, the court overruled the insurer's demurrer, holding that the insured stated a breach of contract claim by alleging the insurer misrepresented policy terms to induce him to purchase a replacement life insurance policy.   35 Pa. D. & C. 4th at 61-62.   A lone Pennsylvania trial court ruling can hardly supply such clearly established South Dakota law as to imply a binding contractual provision in the policy here.[10]   In any event, the facts in Connors are distinguishable.   Plaintiff does not allege defendant misrepresented the policy terms to convince her to buy it; she alleges defendant misrepresented the policy terms to justify the claim denial.

---

[10]It appears no court has ever cited Connors for plaintiff's claimed proposition.

19

Plaintiff next cites a South Dakota case.   (Docket 25 at p. 23) (citing Grynberg v. Citation Oil & Gas Corp., 573 N.W.2d 493 (S.D. 1997)).   In Grynberg, the South Dakota Supreme Court upheld a jury verdict for tortious fraud, even though the fraudulent activity also constituted a contractual breach. 573 N.W.2d at 499-503.   The court relied on the independent tort doctrine, which allows a plaintiff to "prove an independent tort that is separate and distinct from the breach of contract."   Id. at 500.   Grynberg permits both tort and breach of contract claims for the same conduct in appropriate circumstances.[11]   It does not stand for the proposition that all insurance contracts contain an implied provision barring misrepresentation.

Plaintiff's failure to show an implied anti-misrepresentation provision exists in her insurance contract is dispositive.   Nevertheless, the court briefly looks to other sources of law.   The SDUTPA does prohibit insurers from "misrepresenting the terms of any policy[.]"   SDCL § 58-33-5.   Unlike the SDUTPA provisions discussed above, insureds may sue for a violation of this provision.[12]   Id. at § 58-33-46.1.   But the existence of this cause of action does not automatically show that the insurance contract at issue here contains an implied anti-misrepresentation provision.   If anything, it appears the South Dakota Legislature did not intend misrepresentation to constitute a breach of an

---

[11]Plaintiff alleged a separate deceit claim.   (Docket 1 at ¶¶ 50-55).   No party moved for summary judgment on that claim.   See infra Section V.

[12]As discussed below, see infra Section V, plaintiff alleged a separate misrepresentation claim based on this provision of the SDUTPA.

insurance contract, since it created a separate cause of action to address that harm.

Finally, the court considers whether the implied covenant of fair dealing creates an anti-misrepresentation provision.   Certainly, the SDUTPA shows South Dakota public policy prohibits an insurer from misrepresenting a policy. But plaintiff argues defendant should be liable for reprinting an erroneous policy module in its denial letter.   The denial letters stated the Gregersons "notified [defendant] of a significant shortage upon the taking of an inventory[.]"   (Docket 26-4 at p. 52).   It did not recite any facts indicating the denial was based on wrongful conversion.[13]   Construing the insurance contract to contain an implied provision barring misrepresentation under these circumstances could improperly penalize thoughtless error, as opposed to malice or negligence. Given the paucity of authority for construing an insurance contract in this way, the court declines to do so.

However, plaintiff's separate misrepresentation claim will proceed to trial. See infra Section V.   Cabining her breach of contract claim to the payment delay theory will cause little prejudice.   The court holds the alleged misrepresentation cannot constitute a breach of contract.   Summary judgment is granted to defendant on this theory of breach.

---

[13]The letters also specifically stated "any typographical errors or differences [between the letter and the policy] are not intended to alter . . . the terms of coverage provided[.]"   (Docket 26-4 at p. 52).

### D.    Damages

Defendant alleges plaintiff failed to produce "any evidence supporting any kind of a damage claim." (Docket 30 at p. 18).   It complains plaintiff provided no "documentation of her economic loss claim[.]"   Id.   Plaintiff contends she was damaged by paying Mr. Holloway's attorney's fees and "the 10% per annum loss of use for the funds Defendant should have promptly paid." (Docket 33 at p. 17).   She also points to her deposition testimony, where she alleged she suffered emotional and financial damage from the payment delay.   Id. at pp. 17-20.

"[D]amages for breach of contract consist of the amount that will compensate the aggrieved party for all of the detriment caused by, and that are the likely result of, the breach."   Stern Oil, 908 N.W.2d at 155 (internal quotation omitted).   Lost profits stemming from a breach are available if the plaintiff establishes "a reasonable relationship between the method used to calculate damages and the amount claimed."   Id. at 151 (internal quotation omitted).   However, "[t]he amount of recovery may not exceed the amount the plaintiff would have gained if the contract had been fully performed."   Id.

The South Dakota Supreme Court has "stated that 'the amount of damages does not to need be proven with absolute exactness' and ha[s] affirmed an award's amount based solely on the testimony of a plaintiff."   ISG, Corp. v. PLE, Inc., 917 N.W.2d 23, 32 (S.D. 2018) (quoting Rumpza v. Zubke, 900 N.W.2d 601, 608 (S.D. 2017)).

22

> The party alleging injury has the burden of proving the amount of damages with reasonable certainty.  Once the existence of damage has been shown by a preponderance of the evidence, a claimant must produce only the best evidence available to allow a jury a reasonable basis for calculating the loss.

Rumpza, 900 N.W.2d at 607-08 (internal quotation omitted).

Plaintiff provided enough evidence of her damages to survive summary judgment.  She testified her and her husband "could have paid off [their] debt" if the claim had been paid timely.  (Docket 26-1 at p. 114).  Losing the cattle caused a "snowball" effect—the lost calves would have later reproduced, providing more income for the Gregersons.  Id. at pp. 114-17.  The loss of the cattle—which was not offset by a claim payment—caused plaintiff to fall behind on loan payments.  Id. at pp. 116-17.  These financial troubles caused much stress for the Gregersons.  Id. at p. 117.

Moreover, there is necessarily some quantum of loss to the Gregersons from the delayed payment, if the jury concludes the delay was wrongful.  If defendant had timely paid the claim, the Gregersons would presumably have invested the funds, in cattle or otherwise.  The income the claim would have generated over the two years may be loss attributable to the breach.[14]  The jury could award that sum in damages.

The court finds there is a triable question of fact as to what, if any, damages plaintiff suffered, if the jury finds defendant breached the insurance

---

[14]The court presumes this sum is what plaintiff refers to when she claims "10% per annum loss of use for the funds Defendant should have promptly paid." (Docket 33 at p. 17).   Plaintiff did not explain the origin of the ten percent figure.

23

contract by unreasonably delaying payment on the claim.   Contrary to defendant's argument, plaintiff need not provide documentary evidence other than her own testimony to survive summary judgment or, indeed, to prevail at trial.   ISG, Corp., 917 N.W.2d at 32.   Defendant's motion for summary judgment on damages is denied.

**IV.   Bad Faith**

Defendant moved for summary judgment on plaintiff's bad faith claim.   It argues it had a reasonable basis to deny the claim, pointing to the inventory discovery exception.   (Docket 30 at pp. 10-13).   It also asserts plaintiff did not "specify how [its] investigation was inadequate."   (Docket 30 at pp. 13-14).   In response, plaintiff contends defendant is estopped in this litigation from denying coverage for the claim existed, that it wrongfully denied the claim, and that its investigation of the claim was inadequate.   (Docket 33 at pp. 2-13).   The court finds a jury must determine the reasonableness of defendant's investigation and denial.

**A.   Legal standard**

South Dakota recognizes a "cause of action against an insurance company for bad faith failure to pay a claim."   Champion v. U.S. Fidelity & Guaranty Co., 399 N.W.2d 320, 322 (S.D. 1987).   "In order to be successful on a claim of bad faith, a plaintiff must prove: 1) an absence of a reasonable basis for denial of policy benefits, and (2) the insurer's knowledge of the lack of a reasonable basis for denial."   Harvieux v. Progressive N. Ins. Co., 915 N.W.2d 697, 701 (S.D.

24

2018).   "[A]n insurer is permitted to challenge claims that are fairly debatable."
<u>Hein v. Acuity</u>, 731 N.W.2d 231, 235 (S.D. 2007).

Where, as here, the insured and insurer are in a direct contractual
relationship—i.e., first-party bad faith—"[b]ad faith conduct may include the
failure to conduct a reasonable investigation concerning the claim."   <u>Dakota,</u>
<u>Minn. & E. R.R. Corp. v. Acuity</u>, 771 N.W.2d 623, 629 (S.D. 2009).   First-party
bad faith may also occur "when an insurance company consciously engages in
wrongdoing during its processing or paying of policy benefits to its insured."
<u>Hein</u>, 731 N.W.2d at 235.   A delay in payment on a claim may constitute bad
faith if "there was an absence of a reasonable basis for the delay[.]"   <u>Zochert</u>, 921
N.W.2d at 490 (internal quotation omitted).

"The question of whether an insurer has acted in bad faith is generally a
question of fact."   <u>Dakota, Minn. & E. R.R.</u>, 771 N.W.2d at 629-30.   "The
questions of whether the insurer's actions were unreasonable or whether the
claim was fairly debatable must be viewed at the time the insurer made the
decision to deny or litigate the claim, rather than pay it."   <u>Id.</u> at 630.

**B.   Estoppel**

The court first rejects plaintiff's argument that defendant is estopped from
arguing that the Gregersons' claim was not covered under the policy.   She
contends Mr. Fritz's letter stating defendant concluded the claim was covered
now binds defendant from arguing otherwise in this litigation.   (Docket 33 at
pp. 2-3).   She also asserts defendant acted consistently with accepting coverage

existed by paying the claim and attempting to subrogate Mr. Knutson for the

loss.   Id. at p. 4.

Plaintiff does not explain which species of estoppel she seeks to apply.   To

create an equitable estoppel,

> (1)   False representations or concealment of material facts must
>       exist;
>
> (2)   The party to whom it was made must have been without
>       knowledge of the real facts;
>
> (3)   The representations or concealment must have been made
>       with the intention that it should be acted upon; and
>
> (4)   The party to whom it was made must have relied thereon to
>       his prejudice or injury.

Wilcox v. Vermeulen, 781 N.W.2d 464, 471 n.7 (S.D. 2010) (quoting Hahne v.

Burr, 705 N.W.2d 867, 873 (S.D. 2005)).   Judicial estoppel has three elements:

> [T]he later position must be clearly inconsistent with the earlier one;
> the earlier position was judicially accepted, creating the risk of
> inconsistent legal determinations; and the party taking the
> inconsistent position would derive an unfair advantage or impose an
> unfair detriment to the opponent if not estopped.

Id. at 468 (quoting Canyon Lake Park, L.L.C. v. Loftus Dental, P.C., 700 N.W.2d

729, 737 (S.D. 2005)).   Estoppel must be proved by "clear and convincing

evidence."   Action Mech., Inc. v. Deadwood Historical Pres. Comm'n., 652

N.W.2d 742, 751 (S.D. 2002) (internal quotation omitted).

No equitable estoppel exists here.   Plaintiff produced no evidence she

relied on Mr. Fritz's letter "to [her] prejudice or injury."   Wilcox, 781 N.W.2d at

471 n.7.   In fact, the letter was to her advantage, as it resulted in the payment of

her claim.   Nor does plaintiff explain how Mr. Fritz's letter was false.   Id.   She argues throughout her summary judgment briefing that coverage existed for her claim at the time she filed it.   Judicial estoppel is likewise inapplicable.   No court "judicially accepted" Mr. Fritz's letter as binding.   Id. at 468.   There is no "risk of inconsistent legal determinations[.]"   Id.

The estoppel doctrines do not prevent a litigant from taking any inconsistent position.   Plaintiff failed to show the elements of any applicable estoppel theory.   Defendant may argue at trial that the Gregersons' policy did not cover their theft claim.

### C.    Fairly debatable

Defendant asserts the inventory discovery exclusion made the Gregersons' claim fairly debatable.   (Docket 30 at pp. 10-13).   That provision excludes theft losses "where the only evidence of loss is a shortage disclosed upon taking inventory."   (Docket 31-3).   The court finds a jury must decide whether defendant could reasonably have relied on the inventory discovery exclusion to deny the claim.

Defendant continually and materially misrepresents the exclusion in its summary judgment briefing.[15]   It asserts coverage is excluded "for losses *discovered* upon . . . a shortage disclosed upon taking inventory."   (Docket 30 at p. 10) (internal quotation omitted) (emphasis added); see also id. at p. 11 ("[A]

---

[15]Although the court appreciates defense counsel's responsibility to zealously represent his client, he is reminded he also has a duty not to misrepresent facts to a court.   S.D. R. Prof'l. Conduct 3.3(a)(1).

loss *caused by* simple inventory shortage is not intended to be covered."); id. at p. 14 ("Loss *discovered* via an inventory of the livestock is specifically excluded[.]"); Docket 37 at p. 4 ("The inventory exclusion provides a clear exclusion of theft coverage when the claim *arises from* a shortage of livestock based upon an inventory[.").   The exclusion does not sweep so broadly.   A theft loss is excluded "where the *only evidence of loss*" is an inventory shortage. (Docket 31-3) (emphasis added).   It does not matter if the Gregersons first discovered the loss by taking an inventory of their cattle after retrieving them from Mr. Knutson's custody.   What matters is whether the Gregersons had additional evidence of theft aside from the inventory shortage and whether defendant knew or should have known about that evidence when it denied coverage.

By that standard, it is clear triable questions of fact exist.   Defendant denied the claim in a letter dated February 17, 2015.[16]   On November 24, 2014, Mr. Gregerson told defendant's adjuster that his son and others had searched up to 30,000 acres without finding any trace of the cattle.   He also told defendant he believed Mr. Knutson had other charges against him.   The adjuster attempted to contact Mr. Knutson in January 2015, only to discover from his

---

[16]The parties extensively argue whether events after the initial denial show bad faith.   The court need not address the import of those events to resolve the pending summary judgment motions.   Given that bad faith is measured as of "the time the insurer made the decision to deny or litigate the claim, rather than pay it[,]" plaintiff will need to establish before trial that post-denial evidence is relevant.   Dakota, Minn. & E. R.R., 771 N.W.2d at 630.

insurer that he had gone into hiding.   On February 3, the Meade County Sheriff's Office informed defendant it was still conducting an active investigation into the theft and that the Gregersons were not suspects.

These facts—all evidently known to defendant before February 17—contradict its assertion that the inventory discovery exception applied to the Gregersons' claim.   There is a genuine question of material fact as to whether defendant knew there was additional evidence of theft beyond the Gregersons' inventory.   A jury could find defendant unreasonably denied the claim and knew its denial was unreasonable.   Plaintiff need prove nothing else to succeed on her bad faith claim.[17]   <u>Harvieux</u>, 915 N.W.2d at 701.   The court denies defendant's motion for summary judgment on this issue.

### D.   Investigation

Defendant next argues plaintiff failed to show an inadequate investigation.[18]   (Docket 30 at pp. 13-14).   It asserts law enforcement investigated the Gregersons' theft report and "could not substantiate" it.   <u>Id.</u>

---

[17]Plaintiff spends much of her response brief arguing none of the theft exclusions apply to the claim.   (Docket 33 at pp. 5-11).   In a bad faith case, whether the denial was correct is not dispositive.   "The focus is on the existence of a debatable issue, not on which party was correct."   <u>Dakota, Minn. & E. R.R.</u>, 771 N.W.2d at 630 (internal quotation omitted).   Even if plaintiff proved the denial was erroneous, that would not show the denial was unreasonable as a matter of law.   <u>Id.</u>

[18]Defendant argues no investigation "would have changed the undisputed fact that the claim was first disclosed upon the Gregersons' own inventory of their cattle."   (Docket 30 at p. 13).   This argument is premised on a blatantly incorrect interpretation of the inventory discovery exclusion.   <u>See</u> <u>supra</u> Section IV.C.   If defendant's investigation was unreasonable, it cannot be excused by the fact the loss was discovered by an inventory.

Defendant also contends the Gregersons failed to provide it "with any additional facts" between March 2015 and May 2016, hindering its ability to investigate. Id. at p. 14.   Plaintiff argues in response that evidence of the criminal investigation into Mr. Knutson would be inadmissible at trial and that defendant "ignored the evidence [she] submitted[.]"   (Docket 33 at pp. 14-15).   The court finds the reasonableness of defendant's investigation presents a question of fact for the jury.

The court first considers whether evidence that Mr. Knutson was not charged with theft is admissible to support defendant's investigation defense. "As a general rule, evidence that criminal charges were not brought is inadmissible in a civil case arising out of the same events as the criminal charges."   Jackson v. Allstate Ins. Co., 785 F.3d 1193, 1204 (8th Cir. 2015) (quoting Goffstein v. State Farm Fire & Cas. Co., 764 F.2d 522, 524 (8th Cir. 1985)).   Jackson was an Arkansas insurance case, while Goffstein arose in Missouri.   However, South Dakota appears to recognize the same rule.   See Weber v. Bernard, 349 N.W.2d. 51, 54-55 (S.D. 1984) (evidence of criminal acquittal related to motor vehicle accident not admissible in later personal injury action).

Defendant asserts the rule applies only when the subject of the criminal investigation is a party to the subsequent civil case.   (Docket 37 at pp. 9-10). Hence, in defendant's view, the rule would not bar evidence of the investigation into Mr. Knutson, who is not a party to this matter.   Defendant cites no

authority supporting this proposition.   Courts apply this exclusionary rule "because of the higher burden of persuasion in a criminal case and because prosecutorial discretion may consider other factors not relevant in a civil case." Star Comes Out v. Ahsan, No. Civ. 05-5075, 2008 WL 2230776 at *2 (D.S.D. May 28, 2008) (citing Kelly's Auto Parts, No. 1, Inc. v. Boughton, 809 F.2d 1247, 1252 (6th Cir. 1987)).   Defendant's proposed limitation does not account for the rule's rationale.   The rule's motivating factors equally apply whether or not the subject of the criminal investigation is a party to the civil action.   In either case, factors unique to the criminal context control whether charges are brought.

However, the United States Court of Appeals for the Eighth Circuit recognizes an exception to this rule.   In Goffstein, the insured alleged the insurer refused to pay a claim for fire damages "vexatious[ly] and without reasonable cause[.]"   764 F.2d at 525.   The court held evidence the police investigated and determined the fire "had been intentionally set" was admissible to refute the insured's bad faith claim, but affirmed exclusion of evidence that the insured was not charged with arson.   Id. at 524-25.

This case presents a similar situation.   Evidence that Mr. Knutson was investigated regarding the cattle theft, like the investigation into the insured in Goffstein, is relevant to a defense against plaintiff's bad faith investigation claim. Cf. Cedar Hill Hardware & Constr. Supply, Inc. v. Ins. Corp. of Hannover, 563 F.3d 329, 344 (8th Cir. 2009) (admitting, under Missouri law, evidence of insured's actions with regard to alleged arson to "show the information [insurer]

31

had received and relied upon in investigating the claim[.]"). Evidence that law enforcement was investigating Mr. Knutson and that defendant contacted law enforcement regarding the investigation is admissible. However, evidence that Mr. Knutson was not ultimately charged with theft is inadmissible.[19]

Even with evidence that Mr. Knutson was investigated for theft, defendant fell far short of showing no genuine issue of fact exists for trial. "*Insurers* must make a reasonable investigation of insurance claims before denying benefits." Zochert, 921 N.W.2d at 487 (emphasis added). Whatever law enforcement did to investigate the Gregersons' theft report, defendant had an independent duty to investigate the claim. The policy did not require criminal charges against an alleged thief as a prerequisite to coverage. The reasonableness of defendant's investigation cannot be judged against law enforcement's actions.

For similar reasons, evidence that the Gregersons allegedly failed to provide defendant with necessary information does not prove defendant's investigation was adequate. Defendant asserts its denial letters asked for "other evidence of theft" and "what other steps [it] should take to investigate[.]" (Docket 30 at p. 14). But defendant had a duty to investigate "*before* denying benefits." Zochert, 921 N.W.2d at 487 (emphasis added). Defendant cannot conduct an unreasonable investigation, place the burden on its insured to perform an actual investigation and hope to escape a bad faith claim.

---

[19]The briefing on this topic was not extensive. The parties may move for reconsideration of this ruling before trial if they have additional facts or law to offer.

The record shows a triable question exists as to the reasonableness of defendant's investigation.   Defendant interviewed Mr. Gregerson and his friend who loaned money to purchase the lost cattle.   It attempted to interview Mr. Knutson, but apparently gave up after leaving a single voicemail and speaking with his insurer.   It contacted local law enforcement a few times.   This appears to be the extent of defendant's pre-denial investigation of this claim, at least from the portions of defendant's claims file on record.

A jury could certainly find this investigation unreasonable.   It appears defendant made only cursory attempts to contact Mr. Knutson, the alleged thief and obviously a key player in the events leading to the Gregersons' claim. Defendant also did not contact plaintiff's son or his friends—who had conducted an extensive search for the lost cattle—or otherwise attempt to verify the statements Mr. Gregerson made during his interview.   In particular, Mr. Gregerson told defendant he believed there were other charges against Mr. Knutson.   Defendant did not investigate Mr. Knutson's background before denying the claim.   Had it done so, it could have discovered at least one other local rancher claimed to have been cheated by Mr. Knutson.   (Docket 26-4 at p. 67).

The court denies defendant's motion for summary judgment as to the reasonableness of its investigation into the Gregersons' claim.

33

## V.     Other Claims

Aside from her breach of contract and bad faith claims, plaintiff also alleged defendant's actions constituted fraud and deceit, violated the SDUTPA and were malicious, entitling her to punitive damages.   (Docket 1 at ¶¶ 46-55, 57-58).   Her complaint seeks "actual and consequential damages" as well as attorney's fees for the alleged SDUTPA violation.   Id. at ¶¶ 48-49.

Defendant purportedly moved for summary judgment on all counts. (Dockets 29 at p. 1 & 30 at p. 19).   However, its briefing only addresses the breach of contract and bad faith counts.   Even had the court granted summary judgment in favor of defendant on those counts, plaintiff's deceit and punitive damages claims would have survived.   See Biegler v. Am. Family Mut. Ins. Co., 621 N.W.2d 592, 604 (S.D. 2001) (recognizing the availability of punitive damages in deceit action).   Deceit is a separate statutory cause of action in South Dakota.   SDCL § 20-10-1.   As no party moved for summary judgment on those counts, they will proceed to trial.[20]

Plaintiff's SDUTPA count is also separate from her breach of contract and bad faith claims.   Plaintiff asserts defendant's conduct violates SDCL § 58-33-5

---

[20]Punitive damages are also available on plaintiff's bad faith claim. Biegler, 621 N.W.2d at 604.

"and Chapter 58-33 generally."[21]   (Docket 1 at ¶ 47).   Section 58-33-5 criminalizes "misrepresenting the terms of any policy[.]"   A civil private right of action, permitting a plaintiff to recover "all actual and consequential damages[,]" is available for violations of § 58-33-5.   SDCL § 58-33-46.1; see also Tovares v. Gallagher Bassett Servs., Inc., 379 F. Supp. 3d 791, 804-06 (D.S.D. 2019) (allowing § 58-33-5 misrepresentation claim to proceed).   Plaintiff's § 58-33-5 misrepresentation claim survives summary judgment.   After trial, the court will award attorney's fees as appropriate.   SDCL §§ 58-33-3.1, 58-33-46.1.

## ORDER

The court grants summary judgment to defendant on plaintiff's misrepresentation theory of contractual breach, but otherwise denies both summary judgment motions.   Plaintiff's breach of contract, bad faith, deceit, punitive damages and SDUTPA misrepresentation claims will proceed to trial. Accordingly, it is

ORDERED that plaintiff's motion for partial summary judgment (Docket 23) is denied.

IT IS FURTHER ORDERED that defendant's motion for summary judgment (Docket 29) is granted in part and denied in part, as described in this order.

---

[21]To the extent plaintiff wished to assert a claim based on the SDUTPA's provisions concerning "[u]nfair or deceptive practices in dealing with insured[,]" SDCL § 58-33-67, that claim would be barred by the lack of a private right of action.   SDCL § 58-33-69.

IT IS FURTHER ORDERED that the parties shall confer regarding a trial date and shall contact the court on or before August 3, 2020, to schedule the trial.

Dated May 27, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE

36